**Joseph OLEVSKY, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

No. 85–331.

District of Columbia Court of Appeals.

Submitted July 7, 1988.

Decided Sept. 16, 1988.

David C. Venable, appointed by this court, for appellant.

Frederick D. Cooke, Jr., Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Mary L. Wilson, Asst. Corp. Counsel, Washington, D.C., were on the brief, for appellee.

Before TERRY, STEADMAN, and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

■ Laws making it a crime for an employer willfully to refuse to pay those in his employ the wages that are properly due are said to have as their purpose the protection of employees from "the greed of corporate capital." *State v. Feist*, 115 R.I. 201, 341 A.2d 725, 728 (1975). The principal question in this case is whether an individual employer charged with transgressing such proscriptions, who claims to be unable to afford his own attorney, is entitled to a free lawyer pursuant to the Criminal Justice Act. Although an allegedly exploitive capitalist is probably not the prototypical defendant whom Congress had

in mind when it enacted legislation designed, so far as possible, to place the poor criminal defendant on the same footing as his wealthier comrade in travail, we conclude that the language and logic of the Act apply to those who, like the appellant Joseph. Olevsky here, allegedly underpay their employees while selling paint rather than P.C.P. Olevsky was not provided either with assigned counsel or with the statutorily prescribed opportunity to show that he was entitled to one. Accordingly, we reverse his conviction and order a new trial.

I

Olevsky was convicted, at a bench trial at which he represented himself, of one count of willful failure to pay earned wages upon termination, D.C.Code §§ 36–103(1), 36–107 (1981), and two counts of willful violations of the minimum wage laws, §§ 36–213, 36–214.[1] One of the minimum wage convictions was for failure to pay overtime. The other was for retaliation against an employee for filing a complaint with the Wage and Hour Board. Olevsky was sentenced to pay a fine of $250 or, in the alternative, to serve 30 days in jail on the failure to pay count.[2] He was further ordered to pay two fines of $250 each on the minimum wage counts, these fines to be "concurrent" with each other but additional to the fine or imprisonment for failure to pay earned wages. Olevsky paid the fines and did not actually serve time in jail.

Now represented by an attorney, Olevsky contends on appeal that he was improperly denied a jury trial and his right to appointed counsel,[3] citing a variety of constitutional and statutory provisions. The District of Columbia concedes that Olevsky had a statutory right to a jury trial on the

---

1. Olevsky was found not guilty of one count of failure to pay earned wages and one minimum wage count.

2. To avoid confusion with the Minimum Wage Act violations, the phrase "failure to pay" is sometimes used in this opinion as an abbreviation for the offense of willful failure to pay earned wages.

3. Olevsky also challenges his conviction with respect to the minimum wage counts on the grounds that the employee-complainant was a "high salaried executive" who was not entitled to the protections of the minimum wage laws. We need not and do not reach this issue.

minimum wage counts because he faced a substantial fine, and that he may have had a constitutional right to appointed counsel (if he could not afford his own attorney) on the failure to pay counts, because he faced possible imprisonment. The government contends, however, that reversal is unnecessary because, in light of the sentence actually imposed, Olevsky was neither imprisoned (imprisonment being thought by the government to be a precondition to the right to appointed counsel) nor required to pay a fine of the magnitude which would generate the right to a jury trial.

We hold that Olevsky was denied his statutory right to counsel, and that this denial was not cured by the sentence imposed. Accordingly, we reverse his conviction and remand for a new trial without reaching the constitutional issues presented.

## II

At the times relevant to this controversy, Olevsky was the owner of a retail paint store which was located at 5198 Georgia Avenue, N.W. in the District of Columbia. Jeffrey Warren worked in the store from September 1983 to April 1984. This prosecution arose as a result of disputes between Olevsky and Warren over Warren's wages and over the circumstances of his termination.

Basically, Warren claimed, with the support of an investigator for the Wage and Hour Board (the Board) for some of his contentions, that he had not been paid all of the wages to which he was entitled, and that he had been dismissed in reprisal for making a complaint to the Board. Olevsky contended, among other things, that he had fired Warren because Warren had improperly taken money out of the cash register.[4]

At the beginning of the trial, Olevsky advised the court that "I'm *pro se.*" No inquiry was made as to whether he was entitled to an attorney, nor was he interviewed as to his eligibility for appointed counsel pursuant to the Criminal Justice

Act, D.C.Code §§ 11–2601 *et seq.* (1981). As the case proceeded, the trial judge became critical of Olevsky's lack of familiarity with legal procedures and commented several times, on occasion with some asperity, that he ought to have a lawyer. The most consequential of these colloquies was the following:

MR. OLEVSKY: Well, do I have to ask this question, your Honor?

THE COURT: Get a lawyer, it's not up to me to try the case for you.

MR. OLEVSKY: Your Honor, I can't afford a lawyer.

THE COURT: If you can't do it, get a lawyer.

MR. OLEVSKY: I said I can't afford one.

THE COURT: How many times do I have to tell you? Oh, go on, don't give me that.

MR. OLEVSKY: Your Honor, if you would let me approach the bench—

THE COURT: Go ahead and do it and you'll do it the right way. I'm not teaching law school up here. Every question you ask is inadmissible, practically. Even common sense would tell you how to do it right even if you haven't had any law training. Just use common sense.

MR. OLEVSKY: I'm trying to use common—I'm asking him if he recalls—

THE COURT: Just ask your question, don't argue with me. I'm listening here to proper evidence supposedly.

At no time during the trial did Olevsky demand a jury trial, and there does not appear to have been any discussion of the subject. Olevsky was not asked to sign a waiver of his right to a jury trial, nor did he ever do so.

At the conclusion of the trial, Judge Neilson found Olevsky guilty of three of the five counts. The judge's disposition of the charges is capsulized in the following table, which is taken from the government's brief:

---

4. The government's position, supported by some testimony, was that Warren was authorized to "borrow" money from the cash register.

| Charge | Maximum Penalty | Finding | Sentence |
|---|---|---|---|
| A. Failure to Pay Earned Wages (to Jeffrey Warren on regular pay days) in violation of D.C. Code § 36–102 | Under D.C. Code § 36–107, 30 days and/or $300 for first offense 90 days and/or $1000 for subsequent offense. | Not Guilty | ____ |
| B. Failure to Pay Earned Wages (to Jeffrey Warren after termination of employment) in violation of D.C. Code § 36–103(1) | Same as "A" above. | Guilty | $250 or 30 days |
| C. Violation of D.C. Minimum Wage Act (failure to pay Jeffrey Warren minimum wage) in violation of D.C. Code § 36–213 | Under D.C. Code § 36–214 $10,000 and/or 6 months but imprisonment can only be imposed for second offense | Not Guilty | ____ |
| D. Violation of D.C Minimum Wage Act (failure to pay Jeffrey Warren overtime) in violation of D.C. Code § 36–213 | Same as "C" above. | Guilty | $250 in addition to "B" but concurrent with "E" |
| E. Violation of D.C Minimum Wage Act (retaliation against Jeffrey Warren for filing wage law complaint) in violation of D.C. Code § 36–213(3) | Same as "C" above. | Guilty | $250 in addition to "B" but concurrent with "D" |

Olevsky paid the requisite fine in timely fashion and did not have to serve any portion of his alternative jail sentence as imposed on Count B. This appeal followed.

### III

In their briefs in this court, the parties have addressed constitutional and statutory questions first with respect to Olevsky's entitlement to a jury trial and second in regard to his right to appointed counsel. We elect, however, to treat the right to counsel issue first. We do so because if, as Olevsky contends, he was entitled to have an attorney appointed for him at public expense with respect to each of the counts with which he was charged, then this affects the posture of the issue as to his right to a jury trial. Denial of Olevsky's right to counsel, if it occurred, is likely to have contributed to his failure, while acting *pro se*, to have demanded a jury trial.

This court, like other courts, generally declines to decide a question on constitutional grounds if it may be satisfactorily resolved on a statutory basis which avoids the constitutional issue. *E.R.B. v. J.H.F.*, 496 A.2d 607, 609 (D.C.1985). The practice of avoiding constitutional issues if it is reasonably possible to do so is predicated on a fundamental rule of judicial restraint, which is perhaps more deeply rooted than any other doctrine of constitutional adjudication. *Jean v. Nelson*, 472 U.S. 846, 854, 105 S.Ct. 2992, 2996, 86 L.Ed.2d 664 (1985). Accordingly, we turn to the Criminal Justice Act to determine if it is dispositive.

Section 2 of the Act, D.C.Code § 11–2601 (1981), states in pertinent part as follows:

The Joint Committee on Judicial Administration shall place in operation ... a plan for furnishing representation to any person in the District of Columbia who is financially unable to obtain adequate representation—

(1) who is charged with a felony, or misdemeanor, or other offense for which the sixth amendment to the Constitution requires the appointment of counsel or for whom, in a case [in] which he faces loss of liberty, any law of the District of Columbia requires the appointment of counsel.

Section 11–2601 goes on to provide for the furnishing of such representation to a number of other categories of individuals, including (but not limited to) persons charged with violation of probation or parole, persons collaterally attacking their sentences after conviction, fugitives, and juveniles charged with delinquency or with being in need of supervision.

On its face, § 11–2601 appears to be mandatory. The plan which the Joint Committee is commanded to develop is one "for furnishing representation ... to any person" who is within any one of the enumerated groups. If § 11–2601 is read together with Section 3 of the Act, D.C.Code § 11–2602 (1981), however, it becomes ap-

parent that mandatory appointment of counsel for every defendant in every prosecution was not what Congress intended.

Section 11–2602 prescribes separate procedures for two different situations, the first where counsel *must* be assigned, and the second where counsel *may* be assigned in the exercise of the discretion of the court. As to the first (mandatory) category, § 11–2602 provides as follows:

In all cases where a person faces a loss of liberty and the Constitution or any other law requires the appointment of counsel, the court shall advise the defendant or respondent that he has the right to be represented by counsel and that counsel will be appointed to represent him if he is financially unable to obtain counsel. Unless the defendant or respondent waives representation by counsel, the court, if satisfied after appropriate inquiry that the defendant or respondent is financially unable to obtain counsel, shall appoint counsel to represent him.

With respect to the second (discretionary) category, § 11–2602 states that

in all cases covered by this Act where the appointment of counsel is discretionary, the defendant or respondent shall be advised that counsel may be appointed to represent him if he is financially unable to obtain counsel, and the court shall in all such cases advise the defendant or

respondent of the manner and procedures by which he may request the appointment of counsel.

Although the statute could be clearer, it appears to define cases in which appointment of counsel is mandatory (as opposed to cases in which it is discretionary) as being those in which

a person faces a loss of liberty and the Constitution or any other law requires the appointment of counsel.[5]

The maximum penalty which Olevsky faced with respect to each of the failure to pay counts (Counts A and B) was imprisonment for 30 days and a $300 fine. Obviously, he was threatened with the loss of liberty, and the Corporation Counsel concedes that under *Argersinger v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), Olevsky, if indigent, should have been provided with the assistance of counsel on these charges.[6]

The situation is less clear with respect to Counts C, D and E (the alleged Minimum Wage Act violations). If Olevsky, as a first offender, had been tried on those counts alone, he would not have faced a possible loss of liberty. Accordingly, appointment of counsel for him on those charges only would not have been mandatory. Arguably, however, the minimum wage counts, each of which is punishable by a maximum fine of $10,000, which carries with it a statutory right to demand

---

5. It is worth noting that in the version of the Criminal Justice Act initially proposed by the House of Representatives, the Act would have applied by its terms only in cases "where the United States Attorney prosecutes or would prosecute were the defendant not a juvenile." *See* Legislative History, P.L. 93–412, D.C. Code Legisl. and Admin.Service, District of Columbia Laws, 93d Cong., 2d Sess. 415, 417 (1975) (hereinafter Legislative History). This version would, of course, have been inapplicable to the present case. As Chief Judge (now Senior Judge) Gerard D. Reilly of this court explained during the course of the Congressional discussions, however, many charges requiring appointment of

counsel are prosecuted by the District of Columbia. *Counsel for Indigent Criminal Defendants: Hearings on H.R. 14374 and H.R. 14376 Before the Subcomm. on the Judiciary of the Committee on the District of Columbia, House of Representatives*, 93d Cong., 2d Sess., 28 (1974). The statute as enacted did not contain the provision of the House bill which would have made it inapplicable to prosecutions by the Corporation Counsel.

6. In light of this concession, we need not deal definitively with the potentially troubling language of § 11–2602, *see* pp. 81–82, *supra*. The conditions for appointment of counsel,

a trial by jury,[7] were misdemeanors [8] within the meaning of § 11–2601, so that appointment of counsel under the Act was at least discretionary.[9] If so, then Olevsky had the right pursuant to § 11–2602 to be advised of the procedures under which he could request that an attorney be provided for him,[10] and the trial judge had the obligation to recognize that he had a discretionary right to appoint counsel for Olevsky and to exercise that discretion in an informed and meaningful manner. *Johnson v. United States*, 398 A.2d 354, 363 (D.C.1979).

■ We need not resolve this issue, however, for we conclude that where an indigent defendant is convicted in a single trial of several offenses, and was deprived of his right to have counsel appointed with respect to one or more of them, then all the convictions are subject to reversal. A lawyer cannot effectively represent a client with respect to part of a case. He or she cannot be expected to make an impassioned address to the trier of fact with respect to the defendant's innocence as to Count A, and then to slink away inconspicuously to a seat at the counsel table (or even in the audience) while the client tries to cope with Count D. The same problem arises in every stage of representation, including, among other things, plea negotiations, the calling and examination of witnesses, articulation of objections, closing argument, and sentencing proceedings. Whatever pristine niceties the academic theorist might devise in the abstract to ensure that the Criminal Justice Act is not extended to cover offenses for which appointment of counsel at public expense may not have been designed, anyone who has any appreciation of the dynamics of a trial knows that it is not

namely (1) that the defendant face a loss of liberty and (2) that the Constitution or any other law requires the appointment of counsel, are recited in the conjunctive. The defendant must apparently *both* face a loss of liberty *and* cite a basis in the Constitution or in some statutory enactment before these conditions are met. If read literally, § 11–2602 seems to suggest that some defendants threatened with loss of liberty are entitled to have counsel appointed and that others are not.

It should be remembered, however, that the statute was enacted before the decision in *Scott v. Illinois*, 440 U.S. 367, 99 S.Ct. 1158, 59 L.Ed. 2d 383 (1979), discussed at pp. 84–85, *infra*. The legislative history contains several allusions to *Argersinger* as requiring appointment of counsel "where there exists the *possibility* of deprivation of liberty." *See, e.g.*, H.R.REP. No. 93–1172, LEGISLATIVE HISTORY, *supra*, at 411. That possibility existed in this case, and from the apparent perspective of those who drafted the Criminal Justice Act, Olevsky had a basis in the Constitution for demanding counsel.

7. D.C.Code § 16–705(b) (1981).

8. D.C.Code § 36–107 (1981), which prescribes the penalties under the failure to pay statute, explicitly states that an employer who violates its provisions shall be guilty of a misdemeanor. Section 36–214, which is the analogue to § 36–107 with respect to Minimum Wage Act violations, does not include any specific descrip-

tion of such offenses as constituting misdemeanors. In light of the substantial fine that can be imposed against a minimum wage first offender, and the prospect of six months in prison for a second offender, we think that Congress probably intended criminal Minimum Wage Act violations to be misdemeanors too.

9. Here, once again, the statute is not characterized by the most luminous clarity. Section 11–2601(1), quoted at pp. 81–82, *supra*, describes as eligible for services under the Act any person charged with a

> felony, misdemeanor, or other offense for which the sixth amendment ... requires the appointment of counsel.

The commas after the words felony and misdemeanor, and the lack of any such punctuation after the word offense, suggest that the qualifying phrase beginning "for which the sixth amendment ..." applies only to "other offense," and not to felony or misdemeanor. If this construction is correct, then the court may, in its discretion, appoint counsel for any indigent person charged with a misdemeanor, even if there is no danger of loss of liberty. No such right would arise with respect to more trivial offenses, such as parking violations, unless the Constitution or a law so required.

10. The only such procedure with which we are familiar is to ask the judge.

feasible to expect an attorney to defend some but not all of the charges against his or her client.

The present prosecution illustrates the impracticality of such constricted representation as vividly as any case could. If the judge had appointed counsel for Olevsky to defend Counts A and B (because he faced loss of liberty on these counts) but not Counts C, D, and E (in which he could receive no time) a remarkable incongruity would have resulted. The substantial fines assessable for Minimum Wage Act violations, as we have noted, would have entitled Olevsky to demand a jury trial, pursuant to D.C.Code § 16–705(b) (1981), as to Counts C, D and E. The far more modest fine and brief imprisonment which Olevsky faced under the failure to pay counts ($250 and 30 days per count) fall well below the threshold for a jury trial under § 16–705(b) (90 days and $300), and these counts would have been triable by the court.[11] Accordingly, if we were to follow such a theory, then counsel would have been allowed to represent Olevsky on the counts tried to the bench, but the unfortunate defendant would have been left to his own devices with respect to the charges triable by the jury. We cannot find that this was what Congress intended.[12] Accordingly, we think that Olevsky, if unable to afford his own attorney, had a statutory right to appointed counsel with respect to the entire information, and can therefore legitimately complain on appeal about the denial of that right with respect to Counts D and E, even though conviction of these counts alone would not have threatened him with loss of liberty.

Nor, as Corporation Counsel argues, can Olevsky's conviction be sustained on the strength of *Scott v. Illinois, supra.* In *Scott,* a sharply divided Supreme Court held

> that the Sixth and Fourteenth Amendments to the United States Constitution require only that no indigent criminal defendant *be sentenced to a term of imprisonment* unless the State has afforded him the right to assistance of appointed counsel in his defense.

440 U.S. at 374–75, 99 S.Ct. at 1162–63 (emphasis added).[13] The decision is framed in terms of what may *not* be done: you cannot be sent to jail if you were involuntarily tried without counsel. It represents, essentially, an exposition of what the Constitution does not permit, and goes no fur-

---

**11.** Nor would Olevsky have had a constitutional right to trial by jury on those counts. *See Jackson v. United States,* 498 A.2d 185, 187 (D.C. 1985).

**12.** Indeed, given the availability of a jury trial for the minimum wage counts, it is hard to believe that the Criminal Justice Act does not even permit discretionary appointment of counsel for persons charged with minimum wage violations. We do not believe that Congress expected an unschooled *pro se* defendant to have to deal alone with the niceties of *voir dire,* the hearsay rule and its exceptions, and the proper articulation and preservation of evidentiary objections.

**13.** The quoted language suggests that it is the sentence to imprisonment, rather than physical incarceration, that triggers the applicability of the right to counsel, and that a trial judge therefore may not sentence an uncounseled defend-

ant to jail. Unlike Scott, who received only a fine, Olevsky was sentenced to 30 days *or* $250, and was arguably constitutionally entitled to counsel even under the *Scott* "after the fact" test. Earlier in the *Scott* opinion, however, the Court, reaffirming that imprisonment is different in kind from a fine or the "mere" threat of imprisonment, described "actual imprisonment as the line defining the constitutional right to appointment of counsel." *Id.* at 374, 99 S.Ct. at 1162. The Court therefore may have contemplated that an unconditional sentence to imprisonment was required, but was not specifically presented with, and therefore did not address, the issue whether a sentence to imprisonment *or* a fine would be sufficient. *See also Nelson v. Tullos,* 323 So.2d 539 (Miss.1975), holding that an uncounseled indigent's right to counsel is not violated if a fine imposed for a misdemeanor is later converted into a jail sentence because of his failure to pay the fine, and *Commonwealth v. Thomas,* 510 Pa. 106, 109–111, n. 7, 507 A.2d 57, 59–60 n. 7 (1986), holding that where an

ther. The Criminal Justice Act, on the other hand, is a remedial statute which creates a procedure which is to be followed by the District of Columbia courts to assure, as explicated in the House Committee's Report, that the poor defendant facing *the possibility* of imprisonment receives appropriate legal representation. The Act commands that counsel be provided to those who qualify and, despite its ambiguities, contains no language which could reasonably be construed as making the right to representation contingent on the ultimate outcome of the case.

This statute was, as we have noted, enacted before the more restrictive cast was placed on the right to counsel in *Scott v. Illinois.* It was designed for a broad remedial purpose, namely to insure that persons charged with crimes in the District of Columbia who were financially unable to obtain an adequate defense would be provided with legal representation which should be, so far as possible, on a par with that available to persons of greater means. *Thompson v. District of Columbia,* 407 A.2d 678, 680 (D.C.1979), citing H.R.REP. No. 93–1172, 93d Cong., 2d Sess. 7 (1974); *United States v. Schappel,* 144 U.S.App. D.C. 240, 245 n. 13, 445 F.2d 716, 721 n. 13 (1971) (construing the federal Criminal Justice Act, 18 U.S.C. § 3006A). Remedial statutes should be liberally construed, *McCree v. McCree,* 464 A.2d 922, 927–28 (D.C.1983), and this principle applies even though, in the case of the Criminal Justice Act, this requires a measure of generosity with the taxpayers' money. *Schappel, supra,* 144 U.S.App. at 245 n. 13, 445 F.2d at 721 n. 13.

It is not uncommon for courts to construe statutes which protect citizens from invidious discrimination or other evils more generously than they read constitutional prohibitions which cover similar territory. *Compare Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971) (Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.,* which prohibits racial and other invidious discrimination in employment, bars conduct with discriminatory consequences, regardless of intent), *with Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (plaintiff must establish intentional employment discrimination to prove violation of equal protection clause of Fourteenth Amendment). The Constitution provides limitations on the authority of the elected branches of government, and a decent respect for the separation of powers leads (or should lead) courts to be cautious before striking down or limiting, on the basis of general constitutional language, an enactment by the people's elected representatives (or even before substituting judicial *fiat* for the lack of any such enactment). When construing a remedial statute enacted by the popularly elected branches, on the other hand, courts do not risk invading the province of the legislature, and are free to do all that is reasonable to achieve the statutory purposes.

 Given the remedial character of the Criminal Justice Act, we are confident that it was not the intent of Congress that the right to counsel should depend on the sentence eventually imposed by the trial judge, or that the judge should be permitted to dispense with providing legal representation for a poor defendant after the fact,[14] by not sentencing him to prison. To hold that the Criminal Justice Act countenances such a procedure would be to alter radically the practice in the Superior Court which has existed since the Act was passed and which has been accepted without challenge

uncounseled defendant was placed on probation but subsequently incarcerated after probation was revoked, his imprisonment resulted from his own probation violation and did not violate his rights.

14. We need not and do not address the question whether counsel need be appointed if the trial judge were to specify, in advance of trial, that no prison sentence would be imposed.

by prosecutors and judges alike.[15] Accordingly, we hold that Olevsky's sentence to punishment not including unconditional imprisonment did not cure the violation of his statutory right to counsel.

## IV

There remains the question of how the trial court shall proceed on remand. We do not think it practicable now to direct that court simply to determine, through a Criminal Justice Act interview, whether Olevsky was eligible for appointed counsel at the time the proceedings were initiated. Instead, Olevsky's eligibility or ineligibility for appointed counsel, if he requests one, shall be determined prospectively through the conventional C.J.A. process.[16]

■ The government concedes in its brief that under D.C.Code § 16–705(b), Olevsky would have been statutorily entitled to a jury trial on counts C, D and E (charging him with violations of the Minimum Wage Act) if he had made an appropriate demand. This concession is well-founded, for the potential fine on each of these counts far exceeded the statutory threshold of $300. Although the government argues that Olevsky waived his right to a jury trial, our holding that he was entitled to counsel on all counts compels us to reject any notion of waiver. A man who was denied the opportunity for counsel can hardly be deemed to have waived a right of which the trial judge did not inform him, which he probably did not know he had, and of which any competent attorney would have advised him. Accordingly, Olevsky is entitled to a jury trial on retrial on Counts D and E.[17]

■ The situation is different as to Count B. The maximum penalty which Olevsky could have received on that count was imprisonment for 30 days and a fine of $300. Olevsky has cited no authority, and we know of none, to suggest that an offense which is *malum prohibitum* only, and in which the maximum penalty is as described above, rises above the level of a petty offense.[18] *Baldwin v. New York*, 399 U.S. 66, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1970). Moreover, Olevsky cannot simply aggregate the maximum penalties of the various offenses with which he is charged and then claim the right to a jury trial if the cumulative penalties would so entitle him. As this court stated in *Scott v. District of Columbia*, 122 A.2d 579, 581 (D.C. Mun.App.1956):

> [We] see no reason why consolidation of a number of petty offenses in one information should confer upon the defendant a right he would not have if the charges were brought in separate informations.

This *Scott* decision—not to be confused with *Scott v. Illinois, supra*—was more recently reaffirmed by this court in *In re Thompson*, 454 A.2d 1324, 1328 (D.C.1982). In light of these decisions, Olevsky is not

---

15. This decision may, however, warrant an examination of the procedures under the Act as applied to offenses prosecuted by the Corporation Counsel.

16. Since Olevsky's fine must be returned to him with the reversal of his conviction, he should, at the very least, be able to contribute significantly to his own counsel fees.

17. On retrial, absent prosecutorial vindictiveness, Olevsky may be sentenced to a fine greater than those originally imposed. *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); *Chaffin v. Stynchcombe*, 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973). Accordingly, the trial judge's imposition of fines below the $300 statutory threshold does not defeat Olevsky's right to a jury on retrial. *See generally Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

18. This case is not like *District of Columbia v. Colts*, 282 U.S. 63, 72–73, 51 S.Ct. 52, 53, 75 L.Ed. 177 (1930), in which the Supreme Court held that a defendant charged with reckless driving of a motor vehicle has a constitutional right to a trial by jury in spite of the fact that the maximum term of imprisonment was only thirty days. The Court explained:

> The offense here charged is not merely *malum prohibitum*, but in its very nature is *malum in se*. It was an indictable offense at common law ... when horses, instead of gasoline, constituted the motive power.

In the present case, the offense charged is *malum prohibitum*, and the potential punishment is insufficient under *Baldwin* to generate the right to a jury trial.

entitled, upon retrial, to a jury trial on Count B.

Accordingly, the judgment of conviction is reversed and the case remanded to the trial court for proceedings consistent with this opinion, including the return of Olevsky's fine pending any retrial.

REVERSED AND REMANDED.